DICKSON CONSTRUCTION, INC., Appellant,

v.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Hibbs–Hallmark & Company, and Billy Hibbs, Appellees.

No. 06–97–00031–CV.

Court of Appeals of Texas, Texarkana.

Submitted Aug. 28, 1997.

Decided Nov. 19, 1997.

Opinion Overruling Rehearing Feb. 4, 1998.

Bill C. Hunter, Darrell D. Minter, Vineyard, Martin, Minter, Dallas, Bruce A. Smith, Harbour, Kenley, Boyland, Longview, for appellant.

Roger L. Mandel, Marc R. Stanley, Stanley, Mandel, Iola, Dallas, for appellees.

Before CORNELIUS, C.J., and GRANT and ROSS, JJ.

## OPINION

GRANT, Justice.

Dickson Construction, Inc. appeals an adverse summary judgment ruling in favor of Fidelity and Deposit Company of Maryland (F & D), Hibbs–Hallmark & Company (Hibbs–Hallmark), and Billy Hibbs, president of Hibbs–Hallmark. Dickson brought suit against the three defendants in the court below for business disparagement, tortious interference, and in the alternative, fraud, civil conspiracy, and breach of fiduciary duty. Additionally, Dickson sued F & D alternatively for violations of Article 21.21 of the Insurance Code and breach of the duty of good faith and fair dealing. Summary judgment was granted on the basis of the affirmative defense of the statute of limitations.

On appeal, Dickson complains that the trial court erred in finding that Dickson's claims were barred by the statute of limitations (1) because limitations was extended by the discovery rule and because the acts amounted to a continuous tort, and (2) because the trial court was premature in ruling on the motion for summary judgment because discovery was incomplete.

In October, 1986, Dickson contacted Hibbs–Hallmark about securing bonding for a $2 million bid with the U.S. Army Corps of Engineers. F & D agreed to provide the requested bonding based upon that information. Later that same month, Dickson told F & D and Hibbs–Hallmark that it had entered into the bonded, excavation contract for the sum of $3,098,000. F & D issued the bond through Hibbs–Hallmark, an independent insurance agency. Dickson paid the initial premium charge of $29,000, an amount based on the contract's initial sum. Dickson commenced work on April 22, 1987, but because of adverse weather conditions, the completion date was extended 250 days with the approval of the Corps of Engineers. Despite this approved delay, Dickson completed its obligations ahead of the modified time allowed. Because the material to be excavated was less than anticipated, the contract was modified to reduce the original contract, creating an underrun. However, at the Corps of Engineer's request, Dickson performed additional work for which it became entitled to additional payment. After these modifications were made, the final contract increased to $3,608,546.40. The Corps of Engineers accepted the completed work on August 17, 1990, and paid Dickson the modified contract sum.

In December 1990, the Corps of Engineers processed two modifications increasing the amount of the contract as a result of additional work it required of Dickson. At the Corps of Engineer's request, Dickson tried to obtain F & D's execution of a consent of surety form through Hibbs–Hallmark to recognize the contract increase. F & D and Hibbs–Hallmark demanded that before the form would be executed, Dickson would first have to pay $8,164 additional bond premium. F & D and Hibbs–Hallmark asserted a claim

against Dickson for an overrun premium and a 21% additional premium surcharge for the extra time it took for Dickson to complete the contract. Dickson disputed this claim. Although the Corps of Engineers confirmed to F & D the total contract price, F & D did not reduce the overrun premium.

In March 1992, the Corps of Engineers agreed to increase the contract another $737,000 due to additional work it required of Dickson. Again, a request was made to F & D to execute the consent of surety form, and again, it was refused.

In January 1993, F & D and Hibbs–Hallmark made an additional demand upon Dickson to pay an additional premium of $14,340 due to the latest contract modifications. The only alleged defamatory, false statement made by F & D or Hibbs–Hallmark regarding Dickson was a comment made by F & D employee John Barnes to Jim Bass, a third party, in January 1993, wherein Barnes stated that Dickson did not pay his bills.

Because of F & D's continuous refusal to execute the consent and surety form, because of F & D's miscalculations in reaching the $14,340 amount when it excluded the underrun and imposed a 22% surcharge on the revised bond premium due to an alleged 22–month delay in performing the contract, and because of Hibbs–Hallmark's two letters to Dickson threatening legal action dated January 12 and April 29, 1993, Dickson filed a formal complaint with the Texas Department of Insurance (TDI), attacking F & D's surcharge demands. The TDI notified F & D of the complaint on June 1, 1993, and requested a formal response pursuant to the Texas Insurance Code. On June 15, 1993, F & D responded by letter, acknowledging their mistake in calculating the surcharge amount and canceling the extra time surcharge. However, F & D still insisted on an overrun premium of $3,523. The TDI notified Dickson of this letter on July 29, 1993. Dickson filed suit on March 9, 1995.

Dickson asserts that prior to June 15, 1993, Dickson's bonding capacity was so restricted that it was unable to effectively bid on large, bonded contracts. Further, Dickson asserts that Hibbs–Hallmark did not protect Dickson's interests, but assisted F & D in furthering the alleged wrongful conduct. Dickson also contends that F & D, Hibbs–Hallmark, and/or Hibbs circulated disparaging credit information about Dickson within the business community.

## STANDARD OF REVIEW

A defendant who moves for summary judgment based upon an affirmative defense must plead the affirmative defense and prove each element of that defense as a matter of law, leaving no issues of material fact.[1] The reviewing court must examine the evidence in the light most favorable to the nonmovant and indulge every reasonable inference in favor of the nonmovant, resolving all doubts in the nonmovant's favor.[2]

■ The trial court granted the summary judgment in this case solely on the basis of the statute of limitations affirmative defense. However, the Texas Supreme Court has recently held in *Cincinnati Life Insurance Co. v. Cates*[3] that when a trial court grants summary judgment on specific grounds, the court of appeals should consider all summary judgment grounds preserved for appellate review in the interest of judicial economy even if those were not the grounds upon which the trial court granted the summary judgment. For that reason, we consider not only the contentions involving the affirmative defenses of statute of limitations, but on the cause of action in which we found the statute of limitations has not run as a matter of law, we address whether the movant has offered proof destroying one of the elements as a matter of law.

## STATUTE OF LIMITATIONS

Most tort actions not dealt with in another statute are governed by the two-year statute

**1.** *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 494 (Tex.1991).

**2.** *Id.* at 495.

**3.** 927 S.W.2d 623, 625 (Tex.1996) (noting that not only had trial court not granted summary judgment on that basis, but trial court had specifically denied summary judgment on other grounds that Supreme Court specifically required this court to consider).

of limitations. For example, courts have held that the following causes of action are governed by the two-year statute of limitations: legal malpractice, negligence and gross negligence, and intentional infliction of emotional distress.

■ Chapter 16 of the Texas Civil Practice and Remedies Code and case law interpreting that chapter provide the requisite statute of limitations periods for most of the various causes of action before us. Under Section 16.003,[4] a cause of action alleging a breach of the duty of good faith and fair dealing must be filed within two years of the accrual of the cause of action,[5] along with civil conspiracy,[6] tortious interference with business relations,[7] and breach of fiduciary duty.[8]

The Texas Supreme Court was in error in its reasoning in *First National Bank of Eagle Pass v. Levine.* In that case, the Court set out to use common law to force tortious interference under a two-year statute, which did not specifically provide for such. In so doing, the Supreme Court established a doctrine of such incorrect construction. A treatise discussing this Supreme Court case states that because of the Supreme Court's broad interpretation of the two-year limitations statute as a general statute of limitations for tort claims, counsel should not rely too heavily on cases that apply the four-year residual limitations to any tort not specifically mentioned in the two-year statute.[9] The Texas Supreme Court chose to ignore in *First National Bank of Eagle Pass* the language of the residual limitations statute, Section 16.051 of the Texas Civil Practice & Remedies Code. This section specifically provides that "[e]very action for which there is no *express* limitation, except an action for the recovery of real property, must be brought not later than four years after the day the cause of action accrues." The term *express* means explicit, direct, declared in terms set forth in words, directly and distinctly stated, and manifested by direct and appropriate language.[10] For this reason, the Supreme Court statutory interpretation is incorrect, but that Court has established this doctrine, and that Court is supreme. Therefore, until the Supreme Court sees the error in its interpretation, we shall adhere to this application.

Because the remark made by F & D, which is the foundation for the business disparagement cause of action, is also the basis for, and is so similar in nature to, the tortious interference with business relationship claim, and based on the Texas Supreme Court's broad interpretation of *trespass* in *First National Bank of Eagle Pass,* the statute of limitations period for business disparagement is two years.[11]

Article 21.21 of the Texas Insurance Code provides that actions under that Article must be brought within two years.[12] In the present case, the statute of limitations has run for all causes of action, excluding fraud, unless it was tolled by the discovery rule.

---

4. Tex. Civ. Prac. & Rem.Code Ann. § 16.003 (Vernon 1986 & Supp.1997).

5. *Perez v. Gulley,* 829 S.W.2d 388, 390 (Tex.App.-Corpus Christi 1992, no writ) (stating that § 16.003 applies to breach of duty of good faith and fair dealing); *see E–Z Mart Stores, Inc. v. Hale,* 883 S.W.2d 695, 700 (Tex.App.-Texarkana 1994, no writ); *Emscor Mfg., Inc. v. Alliance Ins. Group,* 879 S.W.2d 894, 919 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (citing Tex. Civ. Prac. & Rem.Code Ann. § 16.003(a)).

6. *Fisher v. Yates,* 953 S.W.2d 370 (Tex.App.—Texarkana 1997) (citing Tex. Civ. Prac. & Rem.Code Ann. § 16.003); *Allen v. City of Midlothian,* 927 S.W.2d 316, 322 (Tex.App.-Waco 1996, no writ).

7. *First Nat'l Bank of Eagle Pass v. Levine,* 721 S.W.2d 287, 289 (Tex.1986) (holding that tortious interference with business relations was within meaning of *trespass* in Sec. 16.003); *Coppock & Teltschik v. Mayor, Day & Caldwell,* 857 S.W.2d 631, 639 (Tex.App.—Houston [1st Dist.] 1993, writ denied).

8. *See Smith v. Chapman,* 897 S.W.2d 399, 402 (Tex.App.-Eastland 1995, no writ).

9. *See* J. Hadley Edgar, Jr. & James B. Sales, Texas Torts and Remedies § 100.01[3](8th ed.1997).

10. Black's Law Dictionary 580 (6th ed.1990).

11. *See Dwyer v. Sabine Mining Co.,* 890 S.W.2d 140, 142 (Tex.App.-Texarkana 1994, writ denied) (stating, without deciding, that business disparagement limitations period is two years).

12. Tex. Ins.Code Ann. art. 21.21, § 16(d)(Vernon Supp.1997).

Only the alleged fraud cause of action has a four-year statute of limitations period.[13]

## BUSINESS DISPARAGEMENT AND THE DISCOVERY RULE

The elements of a claim for business disparagement are publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special damages.[14] Courts have recognized that an action for injurious falsehood or business disparagement is similar in many ways to a defamation action[15] and a slander of title suit. Both defamation and business disparagement involve the imposition of liability for injury sustained through publications to third parties of a false statement affecting the plaintiff; however, an action for defamation protects the plaintiff's *personal* reputation while an action for business disparagement protects the plaintiff's *economic* interests.[16] Disparagement of a business is more akin to slander of title because both require proof of special damages.[17] In slander of title cases, the plaintiff must plead and prove that a specific sale of property was lost because of the injurious falsehood reflecting on the property's title.[18]

Dickson asserts that its business disparagement cause of action is subject to the discovery rule. The discovery rule exception to the statute of limitations defers the accrual of a cause of action until the plaintiff knew or, in exercising reasonable diligence, should have known of facts giving rise to the cause of action.[19] The rule has been applied in cases when the "nature of the injury incurred is inherently undiscoverable and the evidence of the injury is objectively verifiable."[20]

Although Dickson seeks to avoid the statute of limitations via the discovery rule on appeal only as to the business disparagement cause of action, Dickson cannot assert that the discovery rule is applicable to *any* cause of action because it was not pleaded. A court can only apply the discovery rule where the plaintiff pleads it in an original petition or in an amended or supplemented petition in response to the defendant's assertion of the defense as a matter of avoidance.[21] A matter in avoidance of the statute of limitations not affirmatively raised by the pleadings is waived.[22] Because no pleading affirmatively raises the discovery rule on any of the causes of action, Dickson has waived any error.

Even if the discovery rule were applicable, Dickson discovered F & D's sole disparaging comment in January 1993 almost immediately after it was made, more than two years before it filed suit and past the expiration of the two-year limitations period.[23] Dickson's knowledge of F & D's statement negates Dickson's assertion that the nature of the injury was inherently discoverable.

This point of error is overruled.

## CONTINUOUS TORT

Dickson contends that the causes of action are not barred by the statute of limitations because F & D, Hibbs–Hallmark, and Hibbs engaged in continuous acts that resulted in continuous torts up until June 15, 1993.

13. Tex. Civ. Prac. & Rem.Code Ann. § 16.051 (Vernon 1997); *Williams v. Khalaf*, 802 S.W.2d 651, 658 (Tex.1990); *Ketcham v. First Nat'l Bank of New Boston*, 875 S.W.2d 753, 755 (Tex.App.-Texarkana 1994, no writ).

14. *Hurlbut v. Gulf Atlantic Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex.1987).

15. *Id.*

16. *Id.*

17. *Id.* at 767.

18. *Kidd v. Hoggett*, 331 S.W.2d 515, 520 (Tex.Civ. App.-San Antonio 1959, writ ref'd n.r.e.).

19. *Computer Assocs. Inter. v. Altai*, 918 S.W.2d 453, 456 (Tex.1996).

20. *Altai*, 918 S.W.2d at 456.

21. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex.1988).

22. *Id.*

23. *See Laird v. Texaco, Inc.*, 722 S.W.2d 519, 521–22 (Tex.App.-Beaumont 1986, no writ) (holding that when plaintiff is present in room when defamatory statement is made, statute of limitations begins to run when that statement is spoken).

When a defendant moves for summary judgment based upon the affirmative defense of statute of limitations, the defendant must prove as a matter of law (1) when the cause of action accrued, and (2) if the plaintiff asserts a tolling provision, the defendant must conclusively negate the application of the tolling provision.[24]

Dickson contends that F & D, Hibbs–Hallmark, and Hibbs did not conclusively negate the application of the tolling provision, specifically, the continuous tort.

Typically, the limitations period begins to run when the claim accrues or when damages are sustained.[25] However, an exception to this rule is found with continuing torts. "A continuing tort is one inflicted over a period of time; it involves a wrongful conduct that is repeated until desisted, and each day creates a separate cause of action."[26] A continuing tort does not accrue until the defendant's tortious act ceases.[27] It involves not only continuing wrongful conduct, but continuing injury as well.[28] The continuing nature of the tort is determined by the complained-of injury; there may be either a continuing injury about which the plaintiff complains, which constitutes a continuing tort, or a single, distinct injury despite continued availment to the tort, which does not constitute a continuing tort.[29] Engaging in wrongful conduct that causes injury and then refusing to modify, reverse, or cease that conduct for some period of time thereafter does not constitute a continuing tort; rather, the stat-

ute of limitations begins to run when injury is first sustained.[30]

In the present case, the following interrelated wrongful actions claimed by Dickson underlie all of the causes of action: (1) false, disparaging comments made by F & D about Dickson, (2) F & D's refusal to execute a consent of surety without first receiving additional premium payments from Dickson, and (3) F & D's request to Dickson to pay additional premium.

Dickson asserts that the letter dated June 15, 1993, wherein F & D acknowledges its mistaken calculations and surcharge, illustrates when the tortious act ceases. Because the June 1993 letter is within the two-year period of the date the lawsuit was filed, Dickson asserts that its claims are not barred by limitations.

However, the comment made by the F & D employee in January 1993, and any harm that may have ensued because of that comment, does not constitute a continuing tort.[31]

In *Murray*,[32] the court held that an insurer's denial of coverage constituted a wrongful act, immediately causing damages, and immediately beginning the limitations period, even though the insurer maintained its wrongful denial for six months and later admitted its earlier denial of coverage was unwarranted.[33]

Like the insurer in *Murray*, F & D's wrongful refusal to execute the consent of surety form and wrongful demand of payment of additional premium in December

---

**24.** *Jennings v. Burgess*, 917 S.W.2d 790, 793 (Tex.1996).

**25.** *Upjohn Co. v. Freeman*, 885 S.W.2d 538, 542 (Tex.App.-Dallas 1994, writ denied).

**26.** *Twyman v. Twyman*, 790 S.W.2d 819, 821 (Tex.App.-Austin 1990), *rev'd on other grounds*, 855 S.W.2d 619 (Tex.1993) (quoting 54 C.J.S. *Limitations of Actions* § 177, at 231 (1987)).

**27.** *Upjohn*, 885 S.W.2d at 542.

**28.** *Id.*

**29.** *Upjohn*, 885 S.W.2d at 543.

**30.** *See Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex.1990).

**31.** *See Davis v. Aetna Cas. & Sur. Co.*, 843 S.W.2d 777, 778 (Tex.App.-Texarkana 1992, no writ) (refusing continuing tort theory and stating that injury-producing event is denial of coverage and any subsequent bad acts may be *evidence* supporting cause of action, but is not cause of action itself).

**32.** 800 S.W.2d 826; *see also Arquette v. Hancock*, 656 S.W.2d 627, 629 (Tex.App.-San Antonio 1983, writ ref'd n.r.e.)(holding that statute of limitations on plaintiff's cause of action against constable for refusing to return fine improperly collected from plaintiff began to run immediately at time constable refused to refund money and was not tolled during time period that constable continued to refuse to refund money).

**33.** *Murray*, 800 S.W.2d at 828.

1990 caused Dickson to suffer a loss of bonding capacity immediately. It was December 1990 when Dickson suffered injury and when the limitations period began to run on all causes of action. F & D merely maintained its position until June 1993. The fact that the injury and damages may have continued to grow over time after the initial injury was incurred and that F & D refused to alter its position does not make the wrongful action a continuing tort or toll the running of the statute of limitations.[34] The acts involved did not constitute a continuing tort because all of the causes of action are based on F & D's actions in December 1990, along with the comment made by the F & D employee in January 1993, both dates being outside the two-year limitations period for all causes of action asserted, excluding fraud, which has a four-year limitations period.

Because we affirm the summary judgment based on the statute of limitations affirmative defense as to all causes of action, with the exception of fraud, we need only address whether summary judgment should be affirmed as to the fraud claim. The point of error is overruled on all claims except for the fraud claim.

The movants do not prove as a matter of law that the four-year statute of limitations has run on the fraud claim. Dickson's fraud allegations were general.[35]

In their Original Answers, all three defendants included special exceptions to the fraud claim for lack of specificity. However, the record is silent and does not indicate that they presented their exceptions to the trial court and secured a ruling on them. Based on the condition of the record, all of the special exceptions are therefore waived.[36]

■ The movants in the summary judgment attempted to prove that there was no fraud as a matter of law based solely upon the testimony by deposition of Dickson. Dickson basically testified that he had heard of fraud, but when asked if he understood what it means to him, he answered that he had trouble associating it with him. He otherwise answered several questions by saying that he really could not answer them.[37] The fact that the plaintiff individually does not know the elements of fraud or have a personal knowledge of the acts in question does not prove as a matter of law that such acts did not occur and that such acts could be proven by other witnesses and other evidence. Under the amendments to Rule 166a of the Rules of Civil Procedure, the plaintiff will have some burden of coming forward with

34. *See Daboub v. Gibbons*, 42 F.3d 285, 290–91 (5th Cir.1995).

35. Dickson's allegation on fraud in Section 10.5 of his Original Petition stated the following:
Dickson Construction incorporates by reference the allegations contained in Paragraphs 2.1 through 9.9 herein.
The acts of Fidelity & Deposit, Hibbs–Hallmark and Hibbs constitute actual or constructive fraud perpetrated upon Dickson Construction, causing it damages in excess of the minimum jurisdictional limits of the Court. Fidelity & Deposit, Hibbs–Hallmark and Hibbs are jointly and severally liable for Dickson Construction's actual damages.

36. *See Swinford v. Allied Finance Co.*, 424 S.W.2d 298, 300–01 (Tex.Civ.App.—Dallas 1968, writ dism'd).

37. The pertinent portion of his deposition is as follows:
Q The lawsuit says that you were defrauded by F & D, Hibbs–Hallmark, and Hibbs. How do you contend they defrauded you?
. . . .
A I can't answer.

Q Are there any facts that you know of that would show—well, do you understand what fraud is? Have you ever heard the term "fraud" before?
A What word?
Q Fraud.
A I've heard of it, yeah.
Q Do you have any understanding of what it means to you?
A I have trouble associating it to me.
Q Do you have any trouble associating it with F & D, Hibbs–Hallmark, or Billy Hibbs?
A I really can't answer that.
Q Do you have personal knowledge of any fraudulent acts committed by F & D, HibbsHallmark, or Billy Hibbs?
. . . .
A I can't answer it.
Q So the only facts—I understand that your attorney is telling you that if he's given you a theory where he can take facts and apply them into a theory, he doesn't want you to tell me his theory that he told you. Okay? What I want to know is do you know any facts, not theories, that show fraudulent acts by F & D, Hibbs–Hallmark, or Billy Hibbs?
A No.

evidence on each of the elements to defeat a summary judgment. However, at the time this summary judgment was granted, that burden was entirely upon the movants, and they have not fulfilled that burden on the element of fraud.

This point of error is sustained only as to the fraud claim.

## PREMATURE RULING

 Dickson contends that the trial court erred in not continuing the summary judgment hearing so that Dickson could conduct additional discovery concerning the allegedly false and defamatory statements made by F & D about Dickson. Dickson asserts that in October 1996, it relied upon F & D's assurance that it would supply Dickson with names and addresses of former F & D employees who may have had relevant knowledge of the disparaging remarks, but, instead of providing that information, F & D rushed their summary judgment motion, which was filed December 10, 1996, and rushed the hearing before the names were revealed and depositions could be taken. Presumably, Dickson asserts that additional discovery might have revealed additional defamatory statements made after March 9, 1994, and/or March 9, 1993, and might have revealed facts giving rise to the various causes of action it asserts. Because that discovery could not be had, Dickson asserts that the discovery rule continues to defer the accrual of all causes of action.

However, a court of appeals may only disturb a trial court's denial of a motion to continue a summary judgment hearing if the trial court's denial constituted a clear abuse of discretion.[38] The appellate court may consider the following factors in determining whether the trial court abused its discretion: (1) the length of time the case has been on file, (2) the materiality of the discovery sought, and (3) whether due diligence was exercised in obtaining the discovery.[39]

First, Dickson filed its Original Petition on March 9, 1995, but the trial court did not hear Defendants' First Amended Motion for Summary Judgment until January 6, 1997, almost two years later. Arguably, the trial court did not abuse its discretion in denying the continuance of the hearing because Dickson had ample time to conduct all necessary discovery.

Second, Dickson has not presented good reason to indicate that anything material would have been found had additional discovery time been given, including the testimony of the two witnesses.

Third, Dickson has not demonstrated due diligence in seeking the names and addresses of the former employees. For example, it has not offered evidence (1) to show that F & D possessed that information, (2) to show why it did not move to compel that information during the two years following Dickson's Original Petition, (3) to show that the former employees would have had any knowledge of any defamatory statements made after March 9, 1993, (4) to show that it engaged in independent efforts to locate the former employees, or (5) to show that depositions were taken or scheduled of representatives of companies that turned Dickson down for construction bonding after March 9, 1993, because of F & D's actions.

After reviewing these factors as they are applied to the present case, we conclude that the trial court did not abuse its discretion in refusing to continue the summary judgment hearing so that Dickson could conduct additional discovery. This point of error is overruled.

The summary judgment of the trial court is affirmed, except on the fraud claim, which is severed from the remaining claims, reversed, and remanded to the trial court.

## ON MOTION FOR REHEARING

 Excellent briefs have been filed by both sides concerning the appellees' motion for rehearing. In the motion, appellees contend that the case should not be remanded for further litigation on the issue of fraud. The appellees put emphasis on the fact that

**38.** *Levinthal v. Kelsey–Seybold Clinic, P.A.,* 902 S.W.2d 508, 510 (Tex.App.—Houston [1st Dist.] 1994, no writ).

**39.** *Id.*

Dickson was the designated representative of the corporation for purposes of this suit. Rule 201 provides for such a designation. Although notice to a president of a corporation is notice to the company [40] and a company can be considered to have knowledge of all the facts known to its representative,[41] we have found no cases, nor have any been cited to us, that require a president of a corporation or the corporation's designated representative to possess the knowledge of all the facts relative to the litigation.[42] To so hold, would be to set a precedent that might sometimes require the impossible on the part of the designated representative or corporate president.

The appellees could have sought to perfect their summary judgment proof on this point by establishing that there had been testimony that Dickson was the only person in the corporation that had such knowledge about the transaction or by negating the possibility that other officers or employees of the corporation could have possessed this knowledge. Furthermore, the appellees could have required specificity in the pleadings which would not leave this Court to speculate upon what the contended fraud was based. Under the new rules of Civil Procedure, Dickson Construction, Inc. would have the burden on this element in a summary judgment proceeding and, of course, Dickson Construction, Inc. would also have the burden at the trial of such case. But under the applicable rule, as written at the time the summary judgment was granted, the appellees were required to conclusively disprove this contention as a matter of law. They did not.

Because of the nature of the proceeding and the state of the record, we overrule the appellees' motion for rehearing.

---

40. *Phillips v. Hopwood,* 329 S.W.2d 452, 455 (Tex.Civ.App.—Houston 1959).

41. *Texas Utils. Elec. Co. v. Aetna Cas. & Sur. Co.,* 786 S.W.2d 792, 793 (Tex.App.—Dallas 1990)

42. A witness may fit the description in Oliver Goldsmith's *The Deserted Village:*

"And still they gazed, and still the wonder grew, That one small head could carry all he knew."

But, no witness can be expected to know the answer to every question.